**In the Matter of GRAYSON–ROBINSON STORES, INC., Debtor-in-Possession.**

United States District Court
S. D. New York.

March 27, 1963.

As Amended April 8, 1963.

922

Richard V. Bandler, New York City, Martin Mushkin, New York City, for Securities & Exchange Comm.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, by Lloyd K. Garrison, and Eugene F. Roth, special counsel, New York City, for debtor.

Ballon, Stoll, Shyman & Levine, New York City, for Cred. Comm. by Frederick E. M. Ballon, Esq. of counsel, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, by Eugene M. Kline, New York City, of counsel.

Schlesinger & Teller, New York City, by I. E. Schlesinger, New York City, for creditor.

EDELSTEIN, District Judge.

On August 14, 1962, Grayson-Robinson Stores, Inc., the debtor, filed a petition for an arrangement under Section 322 of Chapter XI of the Bankruptcy Act, (11 U.S.C. § 722). The Securities and Exchange Commission has moved pursuant to § 328 of the Bankruptcy Act to (1) intervene in the debtor's pending Chapter XI proceeding and (2) to dismiss the Chapter XI petition unless, within a period to be fixed by this court, the petition is amended to comply with the requirements of Chapter X which provides for corporate reorganizations under the Bankruptcy Act. Bankruptcy Act, § 328, 11 U.S.C.A. § 728 (Supp. 1963);[1] § 701 et seq. 11 U.S.C.A. § 701;

1. 11 U.S.C.A. § 728 provides:
"Dismissal, proceedings; amended petition

"The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have

§ 501 et seq.; 11 U.S.C.A. § 501. The S.E.C. contends that the Debtor's petition has been improperly filed under Chapter XI inasmuch as Chapter XI "is not available for a corporation with publicly held securities where there is need for a thoroughgoing reorganization and recasting of the corporation's financial structure."[2] The S.E.C. claims that the proposed arrangement, which contemplates a simple composition of approximately $10,000,000 in unsecured indebtedness, is not feasible since only a reorganization of the corporation's capital structure will provide the necessary working capital needed to rehabilitate the debtor. The S.E.C. further urges that the Debtor's "complex corporate structure" and the alleged overreaching which resulted in Debtor's improvident working agreement with Darling Stores Corporation (Darling) requires a thorough investigation that can be achieved only through the more pervasive Chapter X procedure. The S.E.C. is supported in its motion by Katherine B. Ladd, a substantial landlord claimant.

The Debtor, supported by the Unsecured Creditors Committee, urges that the restoration of its credit and its profitable operation since the inception of the Chapter XI proceeding have alleviated any working capital stringency that may have existed. The Debtor contends that a realignment of its simple capital structure is not required to insure effective relief and that a simple composition with creditors is adequate to restore its corporate health in that a composition will satisfy Debtor's prime needs—the restoration of its credit and the shipment of merchandise. The Debtor fears that the grant of the S.E.C.'s motion will lead inevitably to Debtor's

adjudication as a bankrupt. Debtor maintains that merchandise creditors will not sell on credit to a Chapter X trustee and—since credit purchasing is vital to the success of its retail operation—the grant of the S.E.C.'s motion will lead inexorably to the cessation of shipments of merchandise to Debtor and to Debtor's ultimate disintegration.

Debtor further submits that the operating agreement, known as the Grayson-Darling Operating Agreement, was motivated by sound business considerations and by its terms clearly demonstrates management's loyalty to the Debtor. It contends that the S.E.C. has failed to make a showing that there is a need for an expensive and elaborate Chapter X investigation.

The resolution of these contentions requires the balancing of the factors which govern the choice between Chapter XI of the Act (11 U.S.C. § 701 et seq.) and Chapter X (11 U.S.C. § 501 et seq.). To place the choice between these alternate methods of rehabilitation in the proper perspective, an extensive review of the company's operations and financial affairs is required.

## THE DEBTOR AND ITS BUSINESS

The Debtor, a nationwide retail wearing apparel chain, was organized in 1932 under the laws of the State of California as Grayson Shops, Inc. Until the institution of the Chapter XI proceeding Debtor operated approximately 160 specialty stores and leased discount units selling women's and children's ready-to-wear apparel and accessories. The Debtor also operated, pursuant to the Grayson-Darling operating agreement, the 127 stores of the Darling Stores

been brought under chapter 10 of this title, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 of this title for the filing of a debtor's petition or a creditors' petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition, and the

payment of such additional fees as may be required to comply with section 532 of this title, such amended petition or creditors' petition shall thereafter, for all purposes of chapter 10 of this title, be deemed to have been originally filed under such chapter."

**2.** Affidavit of S.E.C. hereafter cited as S.E.C. affidavit, p. 4.

Corporation, another retail apparel chain whose specialty was the operation of leased concessions in discount centers. In addition the Debtor owned and operated a photographic division, the so-called "Peerless-Willoughby" operation. This division consisted of a series of wholly-owned subsidiaries engaged in the retail sale of cameras, photographic equipment, and audio equipment. For the year ended July 20, 1961, the Debtor's five operating divisions consisted of the Grayson Stores (39 stores in five states); Robinson Stores (64 stores in 23 states); Darling (127 stores in 28 states); discount operations (46 operations in 17 states); and photographic (4 stores and 23 leased operations in 11 states). The photographic division was sold after the institution of the Chapter XI proceeding and the operation of 31 stores and concessions was discontinued during the proceedings. Further closings of other unprofitable stores are contemplated.

Darling is wholly owned by Maxwell H. Gluck, chairman of debtor's Board of Directors. The Debtor maintains its principal office at 550 West 59 Street, New York City, with central warehouses located in New York and Los Angeles.

## CONSOLIDATED BALANCE SHEET

A concise statement of the audited consolidated balance sheet of the Debtor and its subsidiaries, as of July 28, 1962, is as follows:

### ASSETS

| | |
|---|---|
| *Net property | 3,791,534 |
| Investment in A. S. Beck Shoe Corp. | 4,160,709 |
| Net assets of photographic subsidiaries investment in which sold | 698,630 |
| Excess of cost investments in consolidated subsidiaries over book value of net assets—net | — |
| Deferred charges | 756,606 |
| Other assets | 422,266 |

### Current Assets

| | |
|---|---|
| Cash | 2,952,668 |
| Installment accounts receivable—net | 3,959,966 |
| Other receivables | 1,306,965 |
| Current portion of net assets of photographic subsidiaries | 5,628,930 |
| Cash value life insurance | 203,008 |
| Merchandise inventories | 7,492,501 |
| Prepayments | 1,632,915 |
| Other current assets | |
| Total current assets | 23,176,953 |
| Total assets | 33,006,698 |

## LIABILITIES AND CAPITAL

| | |
|---|---|
| Common stock par value $1 | 833,905 |
| Treasury stock | 245,269 |
| Long term debt (Schroeder loan and A. S. Beck debentures) | 7,400,200 |
| Mortgage payable | 121,989 |
| Other liabilities | 348,389 |
| Deferred income | 242,079 |
| Reserves for losses and costs of closing apparel stores | 2,194,000 |
| Capital | 6,069,810 |
| Earned surplus          d | 4,379,849 |

### Current Liabilities

| | |
|---|---|
| Notes payable to banks | 6,368,752 |
| Loans payable | 1,583,890 |
| Current debt matured | — |
| Accounts payable (trade) | 243,747 |
| Accruals, etc. | 1,238,782 |
| Current liabilities of company and apparel subsidiaries suspended August 17, 1962 | 10,986,273 |
| Total current liabilities | 20,421,444 |
| Total liabilities | 33,006,698 |
| Equity common shares | $2.84 |

d  Deficit

*  Depreciation and amortization reserved  8,241,372

The $5,628,930 figure listed as a current asset represents the value of the assets of the photographic subsidiaries sold on October 30, 1962. The $6,368,-

752 figure designated as "notes payable to banks" represents the balance due on loans from Bankers Trust Company which was repaid on October 30, 1962.

## DEBTOR'S OUTSTANDING SECURITIES

The Debtor has outstanding the following issues of securities:

| | |
|---|---|
| 5% Subordinated Convertible Debentures due December 31, 1985 | $4,900,200 |
| Preferred Stock (called for redemption in 1956) | 50 shares |
| Common stock, par value $1 per share | 803,507 shares |

The 5% subordinated convertible debentures are all held by one creditor, the Shoe Corporation of America, as consideration for the sale by Shoe Corporation of 51% of the outstanding common stock of the A. S. Beck Corporation to the Debtor. The debentures are convertible into Debtor's common stock at $21.90 per share and are entitled to fixed sinking fund payments of $200,000 per year beginning December 1, 1965.

The debentures are subordinate to institutional borrowings.

The common stock, listed on the New York Stock Exchange, was in the hands of 3,470 holders of record as of November 30, 1962. As of April 28, 1962, Maxwell H. Gluck was the owner of record and beneficial owner of 260,539 shares, or 32.43% of the outstanding shares of common stock.[3] Debtor's directors and officers, including Gluck, own a total of 265,167 shares.

### DEBTOR'S EARNINGS RECORD

| Years Ended | Net Sales | Net Income [1] |
|---|---|---|
| July 31, 1957 | 41,360,286 | 702,060 |
| July 31, 1958 | 42,080,451 | 532,658 |
| July 31, 1959 | 56,291,195 | 749,989 |
| July 31, 1960 | 63,906,434 | 481,470 |
| July 29, 1961 | 77,354,105 | (1,550,546) |
| July 28, 1962 [2] | 102,575,980 | (6,461,119)[2] |

[1] After taxes but before special items

[2] Including photographic subsidiaries but before losses of $4,297,-768 on special items

## ACQUISITION OF CONTROL BY MAXWELL GLUCK AND THE DARLING-GRAYSON-ROBINSON OPERATING AGREEMENT

Darling Stores Corporation, a New Jersey Corporation, was founded in 1929.

It has one class of outstanding stock, all of which is owned by Maxwell H. Gluck. On November 6, 1960, Darling operated approximately 125 ladies' "ready-to-wear" stores in approximately 35 states. On the same date Gluck en-

3. The 25,539 increase in Gluck's shareholdings is attributable to a stock dividend declared by Grayson subsequent to Gluck's purchase. Testimony of Maxwell H. Gluck before Referee Asa Herzog, Southern District of New York, November 20, 1962, p. 52.

tered into an agreement to purchase the controlling stock interest in Grayson-Robinson from two members of Grayson's former management. Under the agreement Gluck paid $10.50 per share for 235,000 shares representing approximately 32% of the outstanding stock. The total purchase price, $2,467,500 was payable as follows: $715,575 in cash at the closing and the balance of $1,751,925 was evidenced by a non-interest bearing note, due January 5, 1961, secured by the stock.

At the annual meeting of Grayson's stockholders held on November 23, 1960, Stanley Roth, Eugene F. Roth and Gluck were elected directors in place of Hyman P. Kuchai, Phillip S. Harris (the sellers of the controlling interest) and one Chester Roth, who declined reelection. Stanley Roth was elected President of the Debtor.

At the stockholders' meeting of December 19, 1960, Stanley Roth stated that the new management "[has] been concentrating first on orienting ourselves * * * to the various aspects of the Company, including its personnel, store operations and organizational economies, all of which have been no inconsiderable task." [4] He further stated that "[w]e have at the same time been sensitive to the need for developing added volume and profits for Grayson-Robinson Stores, Inc., as soon as possible. Among others we have been giving some consideration to ways of accomplishing this objective by some arrangement with Darling Stores Corporation which would be beneficial to Grayson-Robinson Stores, Inc. without merger or consolidation. * * * " [5]

Subsequently, a study was conducted by S. D. Leidesdorf & Co., Certified Public Accountants, and a plan was evolved for the operation by the Debtor of the Darling chain under an arrangement which, in management's opinion, involved a minimum of risk as measured against the potential benefits to be gained. This plan took form in the Grayson-Robinson-Darling operating agreement which was executed on January 5, 1961.

Under the agreement the Debtor purchased all the Darling inventory, supplies, and New York office equipment valued at the lower of cost or market on the basis of the retail method of accounting with respect to the merchandise and at cost with respect to the supplies.[6] Estimated inventory figures, of a general character, were presented by Leidesdorf & Co. in early January 1961, and final figures were not determined until February 1961. These figures are:

| | |
|---|---|
| Inventory | $2,798,560.00 |
| Supplies | 377,704.00 |
| | $3,176,264.00 |

Under the agreement Debtor was obliged to purchase the merchandise and supplies and pay all wages and operating expenses for the Darling Stores. The Debtor agreed, as agent for Darling, to operate Darling's stores and departments for a minimum of five years for a compensation equal to 90% of Darling's "store operating profits," with the remaining 10% of the "store operating profits" going to Darling. The agreement further provides that no general and administrative expense is to be

4. Memorandum re Darling Stores Corporation and Grayson Robinson Stores Corporation, Debtor's Exhibit E, p. 4.

5. Ibid p. 5.

6. Ibid. p. 9.
  The standard method of valuing retail inventory as described in the testimony of the Leidesdorf accountant is as follows:
  A physical count of inventory is obtained and is checked by a sampling of the

stock in a predetermined number of stores. Each garment is placed in a designated category and each category is given a retail price. The cost is a fixed percentage of the retail price. Markdowns on the retail price of the goods are made continually throughout the year to meet changed conditions. The lower of the actual cost or the average retail price is the final inventory figure. Testimony of Murray G. Sherman before Referee Herzog, December 3, 1962, pp. 183–197.

charged to Darling's operations; i. e., store and sales supervision, purchasing, administrative, accounting, warehousing and shipping and all supervisory and "main office" expense is charged to Grayson and is excluded from consideration as an expense in determining Darling's store operating profit.

Darling, by a separate agreement dated January 6, 1961, guaranteed that for the year 1961 the compensation of 90% of the consolidated store operating profits to Grayson-Robinson would be no less than six (6%) per cent of combined sales. The liability under the guaranty, however, was not to exceed $500,000. Darling was also entitled as of August 14, 1962, to a payment of $210,000 representing the payment for certain fixtures purchased by Darling since the inception of the operating agreement and thereafter used by Debtor in the operation of the Darling Stores. Darling was further entitled to ninety-two one-hundredths of one per cent of the volume of sales in Darling Stores operated by the Debtor as a rental payment for the use of Darling fixtures acquired prior to the Operating Agreement. Debtor estimates the cost of these fixtures at $5,000,000. The Agreement expires on January 5, 1968, unless cancelled by either party on two years' notice but the agreement contains two four-year options to renew.

## THE RESULTS OF OPERATIONS UNDER THE GRAYSON-DARLING AGREEMENT

For the seven months ended July 29, 1961, and for the twelve months ended July 28, 1962, the results are as follows:

|  | 7 months ended 7/29/61 | 12 months ended 7/28/62 (unaudited) |
|---|---|---|
| Sales | 16,281,277. | 35,743,573. |
| Compensation to Grayson-Robinson Stores, Inc. | 500,000. | 895,608. |
| % of compensation to sales | 3.07% | 2.51% |
| Store operating profit | 414,964. | 1,399,775. |
| Deduct: Depreciation charge (.92% of sales) | 150,098. | 329,670. |
| Fixed asset addition charge | 255,707. | 74,986. |
|  | 405,805. | 404,656. |
| Store operating profit, as defined in agreement | 9,159. | 995,119. |
| 90% of store operating profit, as compensation to Grayson-Robinson | 8,243. | 895,608. |
| Guarantee provision of operating agreement | 500,000. |  |

———◆———

## EXPANSION OF DEBTOR'S BUSINESS AND INCREASED BORROWINGS

During 1961, under the new management, the Debtor embarked upon a substantial expansion program into the retail discount field. This expansion was prompted by what management viewed as "a transformation that was taking place in the retail apparel industry."[7] The management saw that population and purchasing power was shifting from

7. Affidavit of Stanley Roth, p. 21, hereafter cited as Roth Affidavit.

the traditional city shopping areas to the growing suburbs while at the same time sales and profits in conventional downtown stores were decreasing, wage costs were increasing, and long-term rentals entered into in earlier years were becoming unduly burdensome.

Darling, a pioneer in the leased department discount field, had been bucking this unfavorable downtrend although recently with only occasional success,[8] by selling apparel at discount prices in leased departments in established department stores. In discount rental operations leases could be obtained for shorter terms based on straight percentages and with low guaranteed minimum rentals. Discount store landlords provided most of the store fixtures so that capital investments were less in rental operations than in conventional stores. Although the Darling management recognized that its discount profit margins were smaller than in conventional retail operations it found that the greater likelihood of profits resulting from larger volume of sales, together with lower overhead costs more than compensated for the narrower profit margin.

After the discussions and studies culminated in the Operating Agreement more than 40 new leased departments were opened between January 5, 1961, and July 1962. The expansion program required the Debtor to make heavy capital investments in merchandise and to equip the new departments. These investments put a severe strain on the Debtor's working capital which in turn lead to stepped up borrowing. The Debtor financed this expansion program with short term loans secured by all of its saleable assets except inventory. By

October 1961 Debtor was indebted to the Bankers Trust Company (Bankers) in the amount of $5,000,000 in short term loans. $1,762,502.25 of the $5,000,000 figure was due under a loan agreement dated April 10, 1959. On October 25, 1961, a new loan agreement was entered into with Bankers whereby Bankers advanced an additional $2,500,000. To induce Bankers to make the new loan the debtor pledged the stock of its photographic subsidiaries and assigned, as additional security, the notes of these subsidiaries to Bankers. On October 25, 1961, the Debtor's borrowings from banks increased to over $9,000,000, but by October 29, 1962, the indebtedness to Bankers was reduced to approximately $5,300,000. On that date the court approved the sale of the Debtor's photographic subsidiaries and the Bankers indebtedness was thereby discharged.

On July 5, 1961, the Debtor entered into an agreement with the Shoe Corporation of America (Shoe Corporation) pursuant to which Debtor agreed to purchase 51% of the outstanding common stock of the A. S. Beck Shoe Corporation owned by Shoe Corporation, and to acquire the minority interest from the public stockholders on the same terms. In consideration of the purchase of the controlling interest in Beck Shoe the Debtor issued $4,900,000 of 5% subordinated convertible debentures to Shoe Corporation. The Agreement was partially consummated on December 4, 1961, by the delivery of the debentures to Shoe Corporation in exchange for the stock. The Gluck management took control of Beck's Board of Directors on December 15, 1961. Thereafter, 33 shoe departments all supplied solely with

8. A record of Darling's recent sales and earnings is as follows:

| Year Ended | Net Sales | Net Income |
|---|---|---|
| Jan. 31, 1956 | $34,155,537 | $362,534 |
| Jan. 31, 1957 | 29,881,216 | (2,067) |
| Jan. 31, 1958 | 26,911,171 | (48,673) |
| Jan. 31, 1959 | 23,249,025 | (442,987) |
| Jan. 31, 1960 | 24,884,547 | (82,970) |
| 11 months ended | | |
| Dec. 31, 1960 | 25,069,096 | 286,468 |

Beck shoes, were opened in Debtor-Darling locations.[9]

In January 1962, approximately ten months before their loan was discharged, Bankers began to press the Debtor for payments on its outstanding loans. When it became known throughout the trade and financial community that Bankers was putting Debtor on a so-called "current basis" Debtor's trade creditors became anxious concerning Debtor's credit standing. This anxiety, it is alleged, caused a sharp curtailment in shipments of merchandise.

Debtor obtained a letter of intent from an underwriter for the underwriting of a $10,000,000 debenture issue which was registered with the S.E.C. at the end of January 1962. The Debtor anticipated that the debentures would be marketed in May 1962. The proceeds of the debentures would have liquidated the Debtor's bank indebtedness and would have left the Debtor with a substantial surplus to be used as working capital. The Debtor abandoned the registration in May 1962 after the underwriting firm withdrew.

On March 14, 1962, the Debtor, with the consent of Bankers, borrowed $2,-500,000 at 6% interest due September 14, 1962, from the Schroeder Trust Company, (Schroeder), secured by the stock of the A. S. Beck Shoe Corporation and a personal guarantee of Gluck. Gluck's guarantee was secured in turn by his deposit of $1,000,000 in securities of other companies with Schroeder.

On March 26, 1962, the Debtor borrowed $2,500,000 for a term of one year from James Talcott, Inc., (Talcott) at the interest rate of 1/30% per day. The loan was secured by the customer's accounts receivable of 130 of its stores.

On August 14, 1962, the date of the filing of the Chapter XI petition, all of the Debtor's major saleable assets except inventory, namely the assets of the photographic subsidiaries and the Beck common stock, were collateralized as security for the $6,000,000 obligation to Bankers and the $2,500,000 Schroeder loan, respectively. In addition the Shoe Corporation debentures in the amount of $4,900,200 were outstanding, together with approximately $10,000,000 owed to unsecured trade creditors. The sale of the Debtor's photographic subsidiaries, however, not only satisfied the claim of Bankers but, in addition, it discharged a debt of more than $400,000 to a group of merchandise creditors who had perfected liens on the photographic subsidiaries' stock prior to the filing of the Chapter XI proceedings. Moreover, the sale of these subsidiaries also produced

---

9. Beck's earnings during the last five years were as follows:

| Years Ended | Net Sales | Net Income |
|---|---|---|
| Dec. 31, 1957 | $61,355,155 | $1,358,101 |
| Dec. 31, 1958 | 60,391,387 | 846,677 |
| Dec. 31, 1959 | 63,720,381 | 1,139,333 |
| Dec. 31, 1960 | 61,772,389 | 634,110 |
| Dec. 31, 1961 | 58,471,295 | 154,255 |
| 6 months ended | | |
| June 30, 1962 | 29,045,509 | (259,477) |

Neither Darling nor debtor operated shoe departments prior to Debtor's obtaining control of Beck. Thirty-three new shoe departments, all supplied with Beck Shoes, were opened in Debtor-Darling locations soon after Debtor obtained control. Although sales and income had been declining for the three years immediately preceding the purchase, the Beck Corporation was an old and profitable retail shoe chain. Since purchasing Beck, the Adler stores have been sold and the unprofitable Ansonia chain of 16 stores is being liquidated.

The Debtor, as part of the purchase agreement, agreed to make an offer on the same terms and conditions, to the minority shareholders of Beck. Thus any Beck shareholder who desires to exchange his stock for a Grayson-Robinson debenture has the right to do so. Although this obligation results only in a prospective liability to Beck stockholders, the potential liability can reach approximately $4,900,000 upon a full redemption.

a surplus of between $300,000 to $400,-000 in cash.

## OPERATION OF THE BUSINESS

The entire business operation including the Darling affiliates, and, until their sale, the photographic subsidiaries, is operated by one management as an integrated entity. The Debtor has a centralized bookkeeping system and unified sales and purchasing operations. All stores and leased departments in the Darling-Grayson-Robinson chain are separately incorporated and each is given a location number. All purchasing and bookkeeping and housekeeping functions are performed at the home and regional offices for each of the location numbers.

The Darling units are primarily liable for the store or discount department leases. Under the Grayson-Darling Operating Agreement Grayson buys all the merchandise, puts it in the Darling stores, employs the sales force and is the recipient of the cash receipts. Grayson then pays Darling sums equivalent to the rentals. The Grayson subsidiaries are similarly operated and they are also primarily responsible for store leases which the parent corporation has guaranteed.

## THE CHAPTER XI PLAN OF ARRANGEMENT AND OPERATIONS SINCE THE INCEPTION OF THE CHAPTER XI PROCEEDINGS

On August 14, 1962, the date the petition for an arrangement was filed, the Debtor had approximately 4,000 creditors consisting primarily of manufacturers of women's and children's wearing apparel. The total claims of these unsecured creditors approximated ten million dollars. In addition the Debtor had outstanding $4,900,200 of the 5% subordinated convertible debentures issued to Shoe Corporation of America as consideration for the purchase of 51% of the common stock of the A. S. Beck Shoe Corporation. The only major secured creditor, apart from the holder of a mortgage on a small piece of land in California, is the Schroeder Trust Company with a claim of $2,500,000 secured by a pledge of the A. S. Beck stock and by the personal guarantee of Mr. Gluck in the amount of $1,000,000.

The filing of the Chapter XI petition was preceded by a period of sharp decline in merchandise shipments prompted by news that Bankers had become concerned about Debtor's credit. Receipts of merchandise in June 1962 fell to approximately $4,580,000 as against $8,010,000 in the previous June; to $2,-700,000 in July 1962, as against $5,800,-000 in the previous July, and in August 1962, to $960,000 as against $8,070,000 in the previous August.[10] Sales fell sharply but expenses of operation could not be reduced with sufficient rapidity to offset the severe effects of the drop in sales. Rentals and overhead expenses remained constant while the company's cash balance dwindled. The Chapter XI petition was filed, according to Debtor, to enable it to achieve a period of respite during which it could take measures to restore the confidence of its suppliers and to rebuild its sales volume.

On August 20, 1962, a meeting of all the Debtor's general creditors resulted in the formation of a creditors' committee to represent the creditors in all future proceedings and negotiations. From the inception of the Chapter XI proceeding the committee has devoted itself to the task of protecting all of Grayson's creditors including landlord claimants. The committee retained experienced counsel and also the accounting firm of Clarence Rainess and Company, Certified Public Accountants. These firms joined in conducting an independent investigation into the affairs of the Debtor and have conduced extensive examinations of the Debtor's management before the referee. See § 21, sub. a Bankruptcy Act. The committee met for many months and participated in the

---

10. Roth affidavit, p. 12.

formulation of the proposed Plan of Arrangement. On January 7, 1963, the Debtor filed the proposed Plan of Arrangement with Referee Herzog of this court. The Plan provides for the payment of 100% of the claims of unsecured creditors over an eleven year period. The Plan is basically a simple composition among creditors providing for an extension of time for payment of their claims.

The proposed arrangement divides creditors into three classes. Class one consists of debts which have priority under Section 64, sub. a(4) of the Bankruptcy Act, and includes taxes due prior to the filing of the petition and administration expenses. The claims in this first class amount to more than $600,000 and are to be paid in full upon confirmation of the plan. The unsecured claims are divided into two classes. The first consists of the Debtor's outstanding 5% subordinated convertible debentures in the face amount of $4,900,000. The Plan provides for no change in their terms or in the provisions of the Indenture securing them. A default in the payment of semi-annual interest in the amount of $122,505.00 due December 1, 1962, caused the Shoe Corporation to accelerate the principal of the debentures. All interest due and unpaid at the time of confirmation, in the amount required by the Indenture, will be paid in full upon confirmation provided that Shoe Corporation instructs the Indenture trustee to rescind, pursuant to a provision in the Indenture, the declaration of acceleration of principal. Shoe Corporation has not appeared either in support or opposition to the motion. Debtor, however, has informed the court that Shoe Corporation has advised it that it is opposed to a Chapter X proceeding. The Debtor states that it confidently expects to arrive at an understanding with Shoe Corporation regarding its acceptance of the plan and the cancellation of the indebtedness.

The third class includes all other unsecured claims including claims arising from the rejection prior to confirmation of executory leases and contracts. Pursuant to the plan, Debtor will issue non-interest bearing debentures to each unsecured creditor in amounts equal to the full amount of the creditor's claim as proved and allowed by the court. The plan provides for the Debtor to begin making yearly payments against these debentures on January 31, 1965, in amounts equal to either two-thirds of the previous year's earnings or 10% of the full original face amount of the debentures, whichever amount is greater. Beginning in January 1968 the payment on these debentures would be $500,000 distributed pro-rata, or two-thirds of earnings distributed pro-rata, whichever amount is larger. In any event, commencing in January 1968 the Debtor shall be required to pay a minimum of $500,000 on the debentures in fixed annual installments until fully paid, except that the official Creditors Committee, at its sole option, may defer not more than one-half of any January payment for a total period of not more than one year. At the end of the deferment period the deferred amount shall become immediately due. The principal must be fully satisfied not later than eleven years from the date of confirmation.

The proposed plan further provides that Mr. Gluck, as sole owner of Darling, shall relinquish his claim to the 10% of the consolidated store operating profit to which he was entitled under the Operating Agreement. On the basis of the Debtor's estimate that this 10% provision would yield $230,000 per year the Debtor represents that Mr. Gluck's potential contributions for the full period of the agreement, including options, would be approximately $2,990,-000. Mr. Gluck has further agreed that as part of the Plan of Arrangement he will permanently relinquish Darling's right to recoup $492,000 from Debtor, an amount which Darling paid to Debtor pursuant to Darling's guarantee to the Debtor of minimum compensation of

$500,000 for the first seven months of operation.*

Moreover, early in these proceedings, Mr. Gluck agreed to rental reductions in Darling Stores operated by Debtor which approximate, in the aggregate, $124,000 a year. In each of these stores Mr. Gluck's wholly owned corporation is the landlord. Mr. Gluck agreed that these reductions would continue in effect if the proposed arrangement were consummated, otherwise reductions were to be ineffective as of the date they were granted. Mr. Gluck has now agreed as a part of the Plan that these reductions will be permanent. He has reserved to himself, however, the right to take back any of these stores on 90 days' notice to the Debtor. Mr. Gluck has also granted the Debtor the option to close any of these stores and to be relieved of any fixture payments under the Operating Agreement with regard to them. The Debtor estimates that on the basis of average lease terms of five years for these stores, Darling's contribution to the Debtor under this concession will amount to $620,000.

Out of all that Mr. Gluck was entitled to under the Operating Agreement, he will retain only the reduced rentals on a small number of stores and a payment which he has agreed shall not exceed $230,000 a year, which represents the consideration for Debtor's use of Darling fixtures purchased by Darling subsequent to the execution of the Operating Agreement. The total of the potential contributions by Mr. Gluck, directly or through Darling, to the Debtor under the proposed plan is estimated by Debtor to be approximately $4,500,000 or about 40% of the total of the claims of unsecured creditors.

The Plan contains another provision which involves Mr. Gluck's participation. Upon confirmation of the Plan, Mr. Gluck will transfer 100,000 shares of common stock of Grayson-Robinson Stores, Inc. to counsel for the Creditors Committee, to be held by him in escrow as trustee. Prior to the expiration of three years from the date of the transfer, Mr. Gluck has the right to repurchase the shares at ten dollars per share. If the shares are not repurchased by Gluck within the three year period shares remaining in escrow at the expiration of the period will be divided pro-rata among the creditors. On the other hand, if the shares are repurchased by Gluck counsel for the Creditors Committee would make a pro-rata cash distribution to the creditors from the proceeds of the shares.

Finally the Plan provides that so long as 40% or more of the General Debentures remain unsatisfied, the Debtor may not, without the prior approval of the Creditors Committee: (a) "expand its operations in any way other than by the addition of such further Woolco (F. W. Woolworth & Co.) units as in the judgment of the Debtor's Board of Directors is in the best interests of the business;" (b) increase executive compensation of present office holders or the members of their families; (c) prepay any of the General Debentures except pro-rata, or prepay any of the Shoe Corporation debentures unless such payment is accompanied by a proportionate prepayment of the General Debentures; (d) retire or purchase any of the Debtor's issued and outstanding common stock.

## DISCUSSION

■ The choice between Chapter XI or Chapter X involves the court in the exercise of its "sound discretion" and "business judgment." Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 456, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); Securities and Exchange Commission v. Liberty Baking Corp., 240 F.2d 511 (2d Cir., 1957), cert. denied, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723 (1957); In re Lea Fabrics, Inc., 272 F.2d 769, 772 (3d Cir., 1959); vacated as moot, Securities Exchange and Commission v. Lea Fab-

---

* Amounts paid under the guarantee are to be repaid to Darling from future earnings. See Debtor's Exhibit 6(c).

rics, 363 U.S. 417, 80 S.Ct. 1258, 4 L.Ed. 2d 1515 (1960). "Like all judicial discretion, it is a discretion that 'must be a legal discretion, rather than one merely at will' * * * or one that simply expresses the court's 'own motions of equitable principles.'" In re Herold Radio & Electronics Corp., 191 F.Supp. 780, 783–784 (S.D.N.Y.1961), quoting Security and Exchange Commission v. United States Realty and Improvement Co., supra, 310 U.S. at 457, 60 S.Ct. at 1054, 84 L.Ed. 1293. Discretion that is premised on the wrong criteria or that disregards well-settled principles is said to "transcend the allowable bounds" and is reversible. General Stores Corp. v. Shlensky, 350 U.S. 462, 468, 76 S.Ct. 516, 100 L.Ed. 550 (1955).

The categorical imperative, so to speak, laid down by the Supreme Court to govern the choice between Chapter X and Chapter XI is "the needs to be served," General Stores Corp. v. Shlensky, supra at 466, 76 S.Ct. at 519, 100 L.Ed. 550, and the court must evaluate "the problems likely to be faced in the attempt to restore the debtor to health." Grubbs v. Pettit, 282 F.2d 557, 562 (2d Cir., 1960). The problem is not one of absolutes. It is multi-faceted and involves a consideration of a complex of intangible as well as tangible variables. Perhaps a quick and ready answer can be found in the fabled Procrustean approach. But the courts have yet to fashion a formula which would yield a pat or facile solution to this problem. No rule has yet evolved which, when resorted to, would have the talismanic effect of yielding the manifestly appropriate result. The resolution of the problem depends on whether the formulation of a plan under the control of the Debtor, as provided by Chapter XI, or the formulation of a plan by Trustees under the supervision of the court as provided by Chapter X, together with the protective provisions of that chapter "would better serve 'the public and private interests concerned including those of the debtor.'" General Stores Corp. v. Shlensky, supra, 350 U.S. at 465, 76 S.Ct. at 518, 100 L.Ed. 550. Some of the questions that are relevant to the particular facts and circumstances of this motion are: Should the Debtor be permitted to continue along the rehabilitation route pursuant to the present plan or should the rehabilitation of the Debtor's estate be governed by a disinterested trustee? Is there a need for an independent study of the Debtor's affairs by a court or trustee? Does the Debtor's situation require something more than an arrangement of only the rights of unsecured creditors without alteration of the relations of any other class of security holders? Does effective relief involve the rearrangement of Debtor's capital structure or is a simple composition of debts adequate to meet Debtor's needs?

The S.E.C. contends that the Chapter XI petition should be dismissed since the proposed plan does not satisfy the requirement of 11 U.S.C.A. § 766 that the proposed Chapter XI plan be "feasible."[11] The S.E.C. points to the Debtor's secured and unsecured debt and urges that a corporation with such a "staggering" total of debt will not be able to nurse itself back to health under Chapter XI. The Commission claims

11. 11 U.S.C.A. § 766 as last amended in 1952 provides:
"Requisites for confirmation
"The court shall confirm an arrangement if satisfied that—
"(1) the provisions of this chapter have been complied with;
"(2) it is for the best interests of the creditors and is feasible;
"(3) the debtor has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of a bankrupt; and

"(4) the proposal and its acceptance are in good faith and have not been made or procured by any means, promises, or acts forbidden by this title.
"Confirmation of an arrangement shall not be refused solely because the interest of a debtor, or if the debtor is a corporation, the interests of its stockholders or members will be preserved under the arrangement. As amended July 7, 1952, c. 579, § 35, 66 Stat. 433."

that Debtor will be unable to meet its annual obligations on the Shoe Corporation debentures and the Schroeder loan let alone undertake the heavy payments to the General Debenture holders that are required under the proposed plan. The S.E.C. concludes that the Debtor is proceeding on "faith" and not on feasibility and that Debtor's history of a working capital stringency requires that a thoroughgoing reorganization of the Debtor's capital structure be effected.

The S.E.C.'s motion to dismiss was filed on January 4, 1963. The Debtor's proposed plan of arrangement was filed with the referee on January 7, 1963, and the amended plan, substantially identical to the initial plan, was filed on February 5, 1963. Although on oral argument the S.E.C. urged that the proposed Chapter XI plan was inadequate to deal with Debtor's problems, it is evident that the Commission's motion, filed before debtor had formulated a plan, was not keyed originally to any plan but was the expression of a general objection to the Debtor proceeding under Chapter XI. However, when the provisions of the proposed plan are analyzed together with the results of Debtor's operations since the filing of the Chapter XI petition, the S.E.C.'s contentions concerning the general unsuitability of Chapter XI to Debtor become somewhat less than persuasive.

In the Chapter XI proceedings, now almost seven months old, the Debtor has achieved operating savings through reductions in home office expenses, store payrolls, rent reductions and the closing of thirty unprofitable stores. It is estimated, without contradiction by the S. E.C., that these savings will aggregate $4,000,000 per year. Additional savings are expected to be achieved by rent reductions and the closing of eleven stores which had operating losses last year. Moreover, during the Chapter XI proceeding, Debtor's financial problems were somewhat alleviated by the discharge of its $6,000,000 liability to Bankers Trust Company, formerly its largest creditor, although Debtor was required to sell its valuable photographic subsidiaries to obtain this relief.

The Commission claims that new capital can be obtained only through a reorganization of the capital structure, but a study of the Debtor's recent operations indicates that the injection of new capital does not appear imperative. The Debtor's management has submitted "cash flow projections" which are predictions of Debtor's weekly cash balances for the year ending January 26, 1964. These predictions, which have been reviewed by S. D. Leidesdorf & Co., are based on Debtor's estimated merchandise turnover for the coming year. Debtor maintains that the predictions are accurate since in the retail apparel industry all cost and pricing variables are easily determined and the prediction merely involves translating volume into earnings. The S.E.C. has not seen fit to assault the accuracy of these predictions in a meaningful way. Debtor's counsel has informed the court that all current bills had been paid through January 10, 1963, and that at the date of the hearing each of the cash balance projections had in fact been accurate within a negligible fraction of error. In addition, at the date of the hearing the Debtor had $1,500,000 in its bank account exclusive of tax payments which are separately banked. Based on these cash projections the Debtor estimates that its net profit before interest but after depreciation for the year ending January 26, 1964, will be $2,200,000. The Debtor expects to be able to finance its projected merchandise purchases for the next year without outside borrowing other than through the usual seasonal factoring of accounts receivable. And beyond this, the Debtor has available to it a tax loss of about $5,500,000 for carryover to the next five taxable years and $900,000 more available for carryover to the next four taxable years. It would appear that at this point the Debtor's working capital stringency has been alleviated by budgeting and cost economies and that a capital reorganiza-

tion of the simple debt structure is not now essential.

■■■ It is now settled that a large company with publicly held securities, such as the Debtor, may have as much need for a simple composition of unsecured debts as a smaller company, and that Chapter XI may serve as the appropriate vehicle for such a composition. General Stores Corp. v. Shlensky, supra at 466, 76 S.Ct. at 519, 100 L.Ed. 550. The S.E.C.'s claims that the Chapter XI proposed arrangement is not feasible have caused the court to examine the proposed Plan with a view toward determining whether, in the absence of the elaborate procedures provided for by Chapter X and considering the debt and Debtor's corporate structure, there is a reasonable likelihood that the desired financial recovery will be effected without prejudicing the rights of the interested parties. Debtor's experience in the Chapter XI proceedings demonstrates, at least thus far, that the Chapter XI proceedings probably are adequate to meet the needs of the Debtor, and to restore its viability without the injection of new capital or a reorganization of its simple capital structure. The court, of course, does not possess the prescience to prognosticate the outcome of the proceeding. It recognizes that the Debtor's rehabilitation must follow an arduous and precarious course, but despite the obstacles the course can be successfully negotiated in Chapter XI provided that management and creditors act in concert in the best interests of the Debtor.[12] The Grayson team of management and the official Creditors Committee have exhibited appropriate supervision thus far in Chapter XI.

■ While it is undeniable that the Debtor's plight was occasioned in no small part by management's inopportune actions, it is equally undeniable that Debtor's credit standing and the free flow of merchandise—so crucial to its profitable operation—have now been restored. The Debtor's performance to date has indicated that there is at least "a reasonable likelihood" that Chapter XI will achieve ultimate rehabilitation. "The nature of the subject matter precludes any greater degree of certainty, but, since the very purpose in affording an opportunity to proceed under Chapter XI manifestly was to permit the debtor, with the concurrence of the unsecured creditors, and, presumably, a majority of the stockholders, to take just such a calculated risk, it is apparent that absolute certainty was never contemplated by

12. There is no merit to the S.E.C.'s contention that Chapter XI is inappropriate to the reestablishment of a publicly held nationwide retail chain. The example of the Chapter XI rehabilitation achieved by another nationwide retail operation, Consolidated Retail Stores, Inc., is an example that such a recovery can be achieved. See In the Matter of Consolidated Retail Stores, Inc., S.D.N.Y.1957, 157 F. Supp. 490.

The arrangement in Consolidated was a simple composition with creditors to pay 100% of all claims within a period of ten years from the date of confirmation of the plan. Each creditor's claim was to be evidenced by (a) the issuance of two notes, an 85% debtor's note payable in ten equal annual installments, without interest, the first installment to be due and payable five years from the date of confirmation; (b) a note of 15% of the debt (15% Debtor's note), payable two years from the date of confirmation and bearing interest at the rate of 5% per annum payable on the due date. The debtor had the option of paying each note before the due date by the issuance of one share of debtor's common stock for each $4.00 (four) dollars of principal.

As part of the plan, a third party agreed to purchase the 85% notes for 55% of the claim, 30% of which would be paid on confirmation, the balance of 25% to be paid within three years of confirmation. The creditor had the option of accepting 40% as full payment of the claim immediately upon acceptance of the third party's offer. The creditor would keep the 15% notes in any event.

Under the plan an indebtedness of $5,174,092.94 was fully paid. Consolidated had 1,514 general creditors and 258 priority creditors. Under the Consolidated arrangement more than $5,000,000 in unsecured creditors' claims were paid pursuant to the purchase option granted by the third party.

Congress." In re Transvision, Inc., 217 F.2d 243 at 246.[13]

The Commission relies principally on the Herold Radio case, supra, the General Stores case, supra, and In the Matter of Davega Stores Corp. (No. 62 B 147, S.D.N.Y., June 1, 1962), as authority for its contention that Chapter X is appropriate under the present circumstances. But all the cases relied on are clearly distinguishable. The Herold case is bottomed on the rationale that the Debtor's working capital stringency which, unlike here, continued unalleviated demonstrated a need for a recasting of the corporation's capital structure. No plan had been presented in Herold at the time of the Commission's intervention and the court found that a solution of the Debtor's problems by a simple composition would present a substantial question of fairness to debenture holders for any plan would have involved the continuance of the interests of junior classes, the preferred and common stockholders, while deferring the creditor claims of public security holders. Unlike Herold, Debtor's proposed Plan of Arrangement does not affect the relative priorities between the different classes of creditors. Although shareholders may be without dividends in the foreseeable future, there is no alteration of their rights. The proposed arrangement contemplates the eventual satisfaction of all creditor claims and, if successful, may well inure to the ultimate advantage of the shareholders. In re Transvision, Inc., supra, 217 F.2d at 247.

And unlike Security and Exchange Commission v. Liberty Baking Corp., supra, 240 F.2d at 513, the proposed plan appears to be fair to all of the interests involved and does not favor the interests of management insiders at the expense of stockholders and creditors. Additionally, it is not without some significance that the Referee, in reviewing the plan upon its presentation stated that it was an "intelligent plan" and "a logical plan from the financial point of view." [14]

The Davega case upon which Debtor relies is distinctly inapposite with relation to the facts herein. The court in Davega found that management's primary loyalty was not to Davega but to Star Corporation, and that this disloyalty was amply evidenced by the management's withdrawal of a $400,000 loan formerly promised to Davega. As for the General Stores case, "[o]ne corporate reorganization [had] already been suffered" and a Chapter XI proceeding did not seem adequate under the circumstances. Supra 350 U.S. at 467, 76 S.Ct. at 519, 100 L.Ed. 550. And it is important to note that in none of the cited cases has a debtor made the progress toward rehabilitation in Chapter XI that Debtor herein has accomplished.

The Commission contends, nevertheless, that there is a need for a comprehensive and objective investigation of the Debtor by a disinterested Chapter X trustee. The Commission points to the Grayson-Darling operating agreement and urges that the agreement should be scrutinized to determine

---

13. But the S.E.C. argues further, concerning feasibility, that the $10,000,000 in general debentures to be issued under the plan "may well be subject" to the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa et seq. which requires the qualification of indentures pursuant to which debt securities are to be issued to the public. 15 U.S.C. § 77ccc. While the S.E.C. admits that the proposed plan does not speak of an indenture, it contends that the proposed plan of arrangement may well be the indenture pursuant to which the securities are being issued. If the plan is the indenture, the S.E.C.'s argument continues, an indenture trustee would be re-

quired. The S.E.C. further claims that the provision of the debentures permitting the creditors' committee to defer principal payments would prevent the qualification of the debentures. Assuming arguendo, in the absence of any authority cited by the S.E.C., that the debentures must qualify under the Trust Indenture Act the S.E.C. has given no reason why an amendment to the plan providing for compliance with the Act would not be feasible.

14. Transcript of Hearings before Referee Herzog, January 7, 1963, p. 111–112.

whether it is fair to the Debtor. Furthermore, the Commission claims that the "complex corporate structure, the profitability of all stores, whether owned by a Darling or a Grayson-Robinson subsidiary" should be carefully examined.

The Commission expresses its primary concern that the conduct of management during the negotiations for the Darling-Grayson-Robinson Agreement as well as the Agreement itself demonstrates the need for close scrutiny of Debtor's management. It is at pains to point out that when the Agreement was executed the Gluck management controlled both corporations and that the Debtor's interest was not represented in the transaction except for the participation by a Leidesdorf accountant on behalf of Debtor. The Commission further asserts that the approximately $3,000,000 sale of Darling's inventory to Grayson pursuant to the agreement may not have been an arm's length transaction. The sale of the inventory, the S.E.C. alleges, came at a most convenient time for Darling, since Darling had approximately $3,000,000 of accounts payable at the same time that it allegedly had a shortage of working capital.

Consequently, the S.E.C. and Katherine Ladd maintain that the Court should infer that these transactions are of dubious propriety and thus require a thoroughgoing Chapter X investigation. But the Court does not agree that circumstances surrounding these transactions lead ineluctably to the inference of misdeeds or actionable collusion. These transactions are equally consistent with an interpretation that they were impelled by good faith and an attempt to execute sound business judgment. While management's decision to consummate the agreement without insuring that Grayson was represented by counsel was unwise, and is not to be commended, it does not lead to the conclusion, without more, that management was guilty of improprieties. There is an absence of any evidence in the record to indicate that the Operating Agreement was improperly obtained. The S.E.C. has cast

a suspicious eye at the Darling inventory figures but an examination of the procedure used by S. D. Leidesdorf does not reveal any variance from the standard retail accounting methods and the inventory valuation thus appears fair. The S.E.C. has not submitted its own analysis of the Darling sale of inventory and the Court is left with the S.E.C.'s contention as the sole basis for a finding of impropriety.

The S.E.C. has attempted to buttress its contention that the agreement was inherently unfair to Debtor by pointing to the heavy losses that Debtor incurred during the first seven months of the Operating Agreement. Assuredly, this is an element to be considered on the question of fairness. These heavy losses, the S.E.C. urges, indicate that the agreement may be inherently unfair and that the heavy losses may continue unabated unless an investigation of the Debtor-Darling arrangement is conducted. The mere fact, however, that the Debtor-Darling arrangement was unprofitable during a time, when it is alleged, merchandise shortages resulted in sharply curtailed sales, of and by itself, proves nothing concerning the intrinsic fairness of the arrangement or the future profitability—or unprofitability—of the operation. A business arrangement that does not yield the anticipated returns may, in the 20–20 vision of hindsight, seem imprudent or unwise, but if the agreement is based on proper business motives the unsuccessful operations under the agreement should not, standing alone, compel the conclusion that the unprofitability is due to the misdeeds of management. The Creditors Committee conducted an extensive examination of Mr. Gluck and other members of management. The testimony reveals that the Agreement might have been profitable had not management's plans gone awry. The Creditors Committee voted to continue the Agreement but many provisions of the Agreement have been suspended since the inception of the Chapter XI proceeding and Mr. Gluck will obtain very little

aside from rental payments and payments for fixtures during the pendency of the proceeding. The fact, however, that Mr. Gluck has relinquished most of his benefits under the Operating Agreement would not foreclose this court from ordering a Chapter X investigation of the original agreement if the court were persuaded that the record necessitated such an inquiry. What is said here should not be interpreted as providing the present management with a medal of merit, but the S.E.C., apart from expressing its suspicions concerning the agreement, has adduced no evidence which would substantiate its concern over management improprieties. The S.E.C.'s arguments amount to mere apprehensions of "possible improprieties" or "ephemeral suspicions." The S.E.C. has made no showing that would warrant a Chapter X investigation. In re Lea Fabrics, Inc., supra, 272 F.2d at 772; In re Transvision, supra, 217 F.2d at 247.

The S.E.C.'s other contentions relating to the disposition of the Klein stock and the alleged complex corporate structure are insubstantial and totally without merit and do not raise the need for an investigation. The spin-off by Debtor of its 8% interest in S. Klein Department Stores in exchange for Debtor's release as guarantor of a $10,000,000 Prudential loan to Klein was effected before the Debtor's management assumed control and Debtor's management was not involved in this transaction.

As for the complex corporate structure the S.E.C. claims that the proliferation of Grayson-Darling subsidiaries involves a complicated and confusing method of operation and that Chapter X is the appropriate forum for the consolidation of subsidiaries in proceedings relating to the parent. There does not appear to be a need for bringing the various affiliates into these proceedings. Grayson-Robinson and Darling units are primarily responsible for the individual store leases and are stocked with merchandise by Debtor. Grayson pays Darling or its affiliates a sum equal to the store rentals. This business method of operation does not require action by the court or by a Chapter X trustee.

Upon a consideration of all the factors and the firmly established criteria and in light of the "needs to be served" the court finds that the continuation of the Debtor in Chapter XI will best serve the private and public interests here represented.

The motion of the S.E.C. for leave to intervene in the Chapter XI proceedings for the purpose of making these motions has been previously granted. The motion to dismiss the Debtor's petition for relief under Chapter XI is denied. So ordered.