GRAYSON–ROBINSON STORES, INC., Debtor-Appellee,

v.

SECURITIES AND EXCHANGE COMMISSION, Appellant.

No. 381, Docket 28191.

United States Court of Appeals Second Circuit.

Argued May 9, 1963.

Decided June 6, 1963.

Rehearing in Banc Denied Aug. 20, 1963.

Commission, New York City (Peter A. Dammann, General Counsel, David Ferber, Associate General Counsel, Securities and Exchange Commission, Washington, D. C., Martin Mushkin, Attorney, Securities and Exchange Commission, New York City), for Securities and Exchange Commission.

Isidor E. Schlesinger (Schlesinger & Teller, New York City), for Ladd & Connecticut General Life Ins. Co.

Lloyd K. Garrison (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Neale M. Albert, Sanford I. Hansell, New York City, of counsel; Eugene Frederick Roth, New York City, Special Counsel to Debtor-in-Possession), for Grayson-Robinson Stores, Inc.

Ballon, Stoll, Shyman & Levine, New York City, and Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for Creditors Committee.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

The issue is the propriety of an order of Judge Edelstein, in the District Court for the Southern District of New York, denying a motion by the Securities and Exchange Commission (hereafter the SEC), to dismiss the petition of Grayson-Robinson Stores, Inc. (hereafter "Grayson" or "the debtor"), a large retail chain, for an arrangement under Chapter XI of the Bankruptcy Act unless the petition was amended or a new petition filed so that the proceedings would continue under Chapter X. The SEC's motion was supported and its appeal has been joined by Katherine B. Ladd and Connecticut General Life Insurance Company (hereafter referred to collectively as a single landlord), who have filed a claim based on Grayson's guarantee of a lease entered into by a subsidiary that has defaulted.[1] Weigh-

Richard V. Bandler, Asst. Regional Administrator, Securities and Exchange

1. The question whether Grayson's guarantees of leases entered into by its subsidiaries are "executory contracts" that may be rejected under § 313 of the Bank- ruptcy Act is at issue in Docket No. 28167, which is to be heard by another panel of this Court. We intimate no views on that question or, in general,

ing the conflicting considerations in the light of the controlling authorities, we have concluded to affirm.

The facts have been so painstakingly stated in Judge Edelstein's opinion, 215 F.Supp. 921, that we shall limit ourselves to the essentials:

Grayson, a California corporation, is a nation-wide chain selling women's and children's apparel. All the stores are separately incorporated, and many of them are operated under leases entered into by the subsidiary and guaranteed by the parent. Until October, 1962, Grayson also owned and operated a "Peerless-Willoughby" division engaged in the retail sale of photographic and audio equipment. Prior to November, 1960, the controlling stock interest in Grayson, some 32%, was owned by Hyman P. Kuchai and Philip S. Harris, who also controlled the S. Klein department stores. Until 1956 Grayson owned all the stock of Klein; in that year 92% was distributed to the debtor's stockholders.

On November 6, 1960, Kuchai and Harris entered into a contract to sell their stock in the debtor to Maxwell H. Gluck, who was and is sole owner of Darling Stores Corporation, another retail chain selling women's apparel. The consideration was $2,467,500, of which $715,575 was payable in cash at the closing and the balance on January 5, 1961. Kuchai and Harris made it a condition that Grayson be released from a guarantee of a 4¼% note of Klein to Prudential Insurance Company, then outstanding in the sum of $7,375,000, which imposed restrictions on both Klein and Grayson, with a breach by either working a default on both. This release was accomplished by a three-cornered transaction in which Grayson transferred to Klein the 8% of Klein stock (68,250 shares) owned by it, Prudential released Grayson from its guarantee, and Klein agreed to purchase the 4¼% $7,375,-000 note. It financed the purchase by paying $1,350,000 and issuing a new 5.7% note in the amount of $6,775,000 to Prudential, which credited Klein with $6,025,000 against the 4¼% note and delivered to Klein for cancellation another 5¾% $750,000 note previously issued by Klein in place of a required prepayment on the 4¼% note.[2] At the annual meeting of Grayson's stockholders on November 23, 1960, Gluck, Stanley Roth (previously president of Darling), and Eugene F. Roth, an attorney, were elected as directors. Gluck became chairman of the board, and Stanley Roth, who resigned as president of Darling, became president. He told a special stockholders' meeting on December 19 that the new management was "sensitive to the need for developing added volume and profits" and that "Among others we have been giving some consideration to ways of accomplishing the objective by some arrangement with Darling Stores Corporation."

As a result of a study conducted by the well-known accounting firm, S. D. Leidesdorf & Co., a plan to that end was shortly evolved. Under this plan Grayson purchased all of Darling's inventory, supplies, and New York office equipment at the lower of cost or market, and agreed to

on the provability, amount, or dischargeability, of claims on Grayson's guarantees of subsidiaries' leases. See Hippodrome Building Co. v. Irving Trust Co., 91 F.2d 753 (2 Cir.), cert. denied, 302 U.S. 748, 58 S.Ct. 265, 82 L.Ed. 578 (1937). The provisions of Chapter XI that are relevant to such issues, §§ 307, 313, and 353, do not differ significantly from the corresponding provisions of Chapter X, §§ 106(1) and (4), 116(1), 202, and 216(4). The treatment of landlords' claims on such guarantees is thus not a pertinent factor in deciding whether the proceedings should remain under Chapter XI

or be transferred to Chapter X, although the subject may have to be considered by the court in determining, on confirmation proceedings, whether the arrangement under Chapter XI "is feasible," § 366(2), as it would also have to be if a plan were being proposed under Chapter X, § 221 (2).

2. The transfer of the 68,250 shares of Klein stock in this transaction for an allegedly inadequate consideration is the subject of two pending suits by Grayson stockholders in the Supreme Court of New York.

operate Darling's stores and leased departments for a minimum of five years; the compensation for this service was set at 90% of the stores' "operating profits", which were to be determined without provision for general and administrative expense. The plan was embodied in an Operating Agreement entered into by Grayson and Darling on January 5, 1961—the same day on which Gluck was obligated to pay Kuchai and Harris approximately $1,751,925 as the balance of the purchase price of the Grayson shares. This sum was in fact paid to Kuchai and Harris by or for the account of Darling, which thereby acquired a proportionate interest in the Grayson stock being purchased; Darling received $500,000 from Grayson on January 19, 1961, in part payment for the inventory, supplies, and equipment and another $750,000 on February 2. By a separate agreement dated January 6, 1961, Darling guaranteed that for 1961 Grayson's 90% of the operating profits would be no less than 6% of sales; however, liability under the guarantee was limited to $500,000, and it was further provided that any amounts charged to Darling under the guarantee would be recouped by it out of Grayson's 90% compensation in years subsequent to 1961. Darling was also to receive $210,000 on August 14, 1962, for certain fixtures purchased by it subsequent to the Operating Agreement and 0.92% of sales as a rental for fixtures earlier acquired.

The new management of Grayson embarked upon a substantial expansion program which took the form of opening leased departments to sell apparel in established discount stores—a method of operation in which Darling had already engaged and which was thought to have advantages in the way of lower capital and overhead costs more than compensating for the lower profit margin. This expansion imposed a severe strain on the debtor's working capital. It sought to alleviate this by increased loans from Bankers Trust Co., as security for which it pledged the stock and notes of its profitable photographic subsidiaries. In a further expansion move it agreed, on July 5, 1961, to buy from Shoe Corporation of America 51% of the stock of A. S. Beck Shoe Corporation for $4,900,000 of 5% convertible debentures (subordinated to bank and other borrowings but not to trade creditors), and to purchase Beck shares from other stockholders on the same terms. The Shoe Company shares were acquired on December 4, 1961, the Gluck management took control of Beck on December 15, and 33 shoe departments selling Beck shoes were later opened in Grayson or Darling locations.

This rapid expansion without increase of the equity base or other long-term financing proved to be unwise. As stated in Grayson's Annual Report for the year ended July 28, 1962, early in 1962 "Pressure to liquidate the major bank loan developed. When knowledge of this pressure became public, serious limitations in trade credit resulted. The flow of merchandise, which is the life blood of the business, was gravely affected." In an effort to meet its problems, Grayson placed a $10,000,000 convertible debenture issue in registration with the SEC on January 26, 1962, and also a $4,702,500 issue of subordinated convertible debentures to be offered to the minority stockholders of Beck pursuant to the agreement with Shoe Corporation of America. However, the registrations had not been completed when the stock market experienced its radical decline in May, 1962, whereupon the underwriter of the $10,000,000 issue withdrew; both registration statements were subsequently withdrawn. Meanwhile, on March 14, 1962, Grayson secured a $2,500,000 six-month loan at 6% from Schroder Trust Company secured by pledge of the Beck stock and a personal guarantee of Gluck collateralized by deposit of $1,000,000 in other securities; on March 26 it borrowed another $2,500,000 for one year from James Talcott, Inc., at 1/30% per day, secured by customer accounts receivable of 130 stores. Despite all this, debts to trade creditors mounted to $10,000,000, and the flow of merchandise was drasti-

cally curtailed.[3] On August 14 a petition under Chapter XI was filed.

On August 20 a Creditors' Committee of 40 persons was elected at a creditors' meeting. One of its co-chairmen represented American Credit Indemnity Co., with a claim of $350,000; the other members were merchandise suppliers with claims of varying amounts, and a representative of display fixture creditors, the total claims represented by committee members being some $2,381,000. At the suggestion of Referee Herzog, a sub-committee of 13 was chosen to act as the Official Creditors' Committee under § 338 of the Bankruptcy Act. The Committee retained counsel and accountants to investigate the debtor's affairs, and a merchandising subcommittee supervised purchases to insure that the debtor did not over-commit itself. With the approval of the court the photographic subsidiaries were sold for approximately $5,800,000, an amount sufficient to liquidate the Bankers Trust Company loan, to discharge liens of more than $400,000 perfected by certain merchandise creditors, and to yield some surplus in cash. The debtor also undertook a rehabilitation program estimated to produce annual savings of $4,000,000 through reducing home office expenses, store payrolls, and rentals, and through the closing of 30 unprofitable stores; further savings from rent reductions and store closings are anticipated.

On November 14 and 20, and December 3, 11 and 21, examinations under § 21(a) of the Bankruptcy Act were held. Wood (treasurer of the debtor), Gluck, Sherman (the Leidesdorf partner who had advised as to the Operating Agreement) and Stanley Roth were examined. The examination, recorded in 377 pages of transcript, was conducted almost solely by counsel for the Creditors' Committee under the supervision of Referee Herzog, but counsel for the appellant landlord was present on all but the first day's examination,[4] and we find nothing to indicate any restraint on his questioning save the Referee's quite proper desire to control the examination so as to avoid needless repetition.

In October, 1962, it became known that the SEC was considering the filing of an application under § 328 of the Bankruptcy Act, as amended, 1952, to require the debtor's proceedings to be transferred to Chapter X. After various conferences, action by the SEC was postponed until after the Christmas season, the debtor assuring the SEC that no attempt would be made to rush through an arrangement before the SEC could move. Meanwhile negotiations with creditors with respect to an arrangement proceeded. On January 3, 1963, the SEC made its motion; a few days thereafter the proposed Plan of Arrangement was filed, to be followed on February 1 by an amended Plan.

The amended Plan provides for the payment of priority claims and also of interest due and unpaid on the subordinated convertible debentures held by Shoe Corporation of America, the latter payment being conditioned on the indenture trustee's rescinding a declaration accelerating the principal.[5] It does not mention and thus apparently leaves undisturbed the $2,500,000 secured loan from Schroder Trust Company and any borrowings secured by assignment of accounts receivable. All unsecured creditors (other than holders of the subordinated convertible debentures) are to receive non-interest-bearing "General Debentures" in the full face amount of their claims; these are to be paid off in not less than 11 years from the date of confirmation, with earlier payments required

3. The following table of receipts of merchandise illustrates this:

| | 1961 | 1962 |
|---|---|---|
| June | $8,010,000 | $4,580,000 |
| July | 5,800,000 | 2,700,000 |
| August | 8,070,000 | 960,000 |

4. The examinations on December 11 and 21 were also attended by an attorney for two other creditors.

5. The debentures are payable December 31, 1985; they are entitled to sinking fund payments of $200,000 a year beginning on December 1, 1965.

as described in the margin.[6] Gluck agrees to deposit with counsel for the Official Creditors' Committee, as Trustee, 100,000 shares of Grayson stock; for three years he may repurchase any or all these shares for $10 per share; at the end of the three years the Trustee is to distribute the shares and/or the receipts from Gluck to the unsecured creditors. The Plan also provides for various alterations in the Operating Agreement with Darling Stores favorable to Grayson. Darling would abandon its right to recoup $492,000 which it paid to Grayson under its guarantee of minimum compensation for the first seven months; Grayson would receive 100% rather than 90% of the store operating profits; and Gluck consents to rental reductions aggregating some $124,000 a year in the case of certain Darling stores leased from corporations owned by him, he being entitled to take back any of these stores on 90 days' notice and the debtor being entitled on like notice to close any of them and be relieved of all further obligation regarding them. Darling is to forgive a balance of $63,000 due from Grayson on July 28, 1962 and the $210,000 payable to it for fixtures, and also agrees to limit the payment of 0.92% of sales as fixture rent to $230,000 a year. Changes beneficial to Grayson are also to be made in the provisions with respect to termination and extension of the Operating Agreement. The aggregate value of these various concessions made by Gluck either directly or through Darling was estimated as approximately $4,500,000. The Plan further provides that so long as 40% of the General Debentures are outstanding, the debtor will not, without prior approval of the Official Creditors' Committee, expand its operations (other than by adding units in Woolworth stores), increase the compensation of its chairman or president or any members of their families, repay any General Debentures except pro rata or any subordinated convertible debentures except pro rata with General Debentures, or retire or purchase common stock. The court is to retain jurisdiction until all the payments to general creditors have been made.

The SEC's motion was supported by an affidavit of one of its attorneys. After setting forth the recent history of the debtor, it alleged, as reasons for the relief requested, the "Financial Inadequacy of Chapter XI," to wit, that successful reorganization would require the raising of new capital; "The Need for Investigation" of the transactions outlined above and other matters, particularly "the competency of management"; the desirability of bringing the debtor's many subsidiaries into the reorganization, as could readily be done under Chapter X, § 129; and the various procedural and substantive safeguards provided by Chapter X but not by Chapter XI. See SEC v. United States Realty & Improvement Co., 310 U.S. 434, 448–455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

In opposition there were submitted an affidavit of Stanley Roth accompanied by numerous exhibits relating to the debtor's recent history and future prospects, affidavits of counsel for the Creditors' Committee and of a co-chairman and a member of that body, and an affidavit of David Dubinsky, President of the International Ladies' Garment Workers' Un-

6. The Minimum Obligatory Fixed Annual Payments are 10% of the full original amount of the General Debentures payable on January 31, 1965, 1966 and 1967 and $500,000 on each January 31 thereafter. In addition, beginning January 31, 1965, the debtor is to pay any excess of two-thirds of net profits after taxes for the fiscal year ended in July of the preceding calendar year over the Minimum Obligatory Fixed Annual Payments, but not if such payment would reduce working capital below the lower of $10,000,000 or the working capital for the end of the fiscal year in which the Plan is confirmed. The Official Creditors' Committee is empowered to defer not more than one-half of any of these required payments for not more than one year.

The principal of the General Debentures is to be accelerated on any default or, at the option of the Official Creditors' Committee, if the debtor has suffered specified losses or if the trustee under the indenture covering the Subordinated Convertible Debentures has accelerated their principal.

ion. One of the exhibits attached to Roth's affidavit was a Cash Flow Projection for the year ended January 26, 1964, reviewed by S. D. Leidesdorf & Co., which purported to show the adequacy of Grayson's cash for this period. As would be expected, his affidavit put the debtor's recent history in a much less invidious light than did the SEC. Although not denying mistakes in judgment, he attributed the debtor's calamities largely to the combined effect of the action taken by its major bank creditor early in 1962 and the failure of its financing due to the stock market decline in May. He asserted that the Operating Agreement with Darling was "clearly beneficial" to Grayson and would be still more so with the changes to which Gluck was consenting under the arrangement; he pointed out that at the inception of the Chapter XI proceedings Darling had proposed and Grayson had accepted an agreement that if the Creditors' Committee so desired, Grayson would reject the Operating Agreement and Darling would consent to such rejection. Most important, he contended, with detailed specifications, that transfer to Chapter X would result in financial disaster, due to two causes. One would be the loss of key employees, who had remained with Grayson "out of loyalty to me and in the faith that we would be able speedily to work out a plan of arrangement and put the business back on its feet," but who would not remain through a lengthy Chapter X proceeding because of their lack of confidence in a trustee unknown to them and their fears that suppliers would cut off merchandise. The other was that institution of a Chapter X proceeding would lead to an immediate stoppage of merchandise sales to Grayson on credit, which would cause disaster before the Trustee was able to restore confidence. The affidavit of counsel to the Creditors' Committee reinforced this latter point, which he claimed to be confirmed by recent experience in the Davega Stores proceedings in the District Court for the Southern District of New York, Docket 62–B–147 (1962). That case, which also involved a chain of retail stores, was transferred from Chapter XI to Chapter X and the trustee subsequently reported his inability to establish credit with merchandise suppliers, as a result of which he was obliged to secure a bank loan by issuing trustee's certificates having priority even over administration expenses; the end result was adjudication as a bankrupt and liquidation. The affidavit of the co-chairman of the Creditors' Committee, who had also served on the Davega creditors' committee, was to the same effect. The affidavit of Elias, president of a dress manufacturing firm and of an association of dress manufacturers, averred that "Based on my conversations with many of the Debtor's suppliers and based on my experience in other arrangement proceedings, I can affirm that the state of mind of the Debtor's suppliers is such that the transfer of this matter to Chapter X would in all probability result in the termination of the Debtor's credit. * * * [G]arment manufacturers are not lawyers, they are businesssmen. They feel, as a group, that shipping on credit to a Chapter X trustee is just bad business." Mr. Dubinsky, with his large experience in such matters, said that the cessation of shipments to Grayson that "would very likely result" from transfer to Chapter X "could set off a chain reaction of bankruptcies among manufacturers due to their loss of Grayson-Robinson business, which would lead to unemployment of our Union members."

With this background of fact we turn to the applicable law. Chapter X of the Chandler Act of 1938, as is well known, finds its source in § 77B, which was added to the Bankruptcy Act of 1898 in 1934, 48 Stat. 911, as Congress' response to dicta of the Supreme Court casting doubt on the validity of the consent equity receivership;[7] Chapter XI

7. Harkin v. Brundage, 276 U.S. 36, 52, 48 S.Ct. 268, 72 L.Ed. 457 (1928); Shapiro v. Wilgus, 287 U.S. 348, 355–356, 53 S.Ct. 142, 77 L.Ed. 355 (1932); First Nat'l Bank v. Flershem, 290 U.S. 504, 515–516, 54 S.Ct. 298, 78 L.Ed. 465

is the child of § 12 of the Act of 1898, 30 Stat. 549, relating to compositions. Section 130(7) of Chapter X demanded that a petition thereunder contain "specific facts showing the need for relief under this chapter and why adequate relief cannot be obtained under chapter XI of this Act", and § 146(2) provided that a petition under Chapter X shall be deemed not to be filed in "good faith" if "adequate relief would be obtainable by a debtor's petition under the provisions of chapter XI of this Act." Chapter XI originally contained no corresponding provisions requiring a petitioner to show why relief should not be sought under Chapter X. However, SEC v. United States Realty & Improvement Co., 310 U.S. 434, 456, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940), ruled that "What the court can decide under § 146 of Chapter X as to the adequacy of the relief afforded by Chapter XI, it can decide in the exercise of its equity powers under Chapter XI for the purpose of safeguarding the public and private interests involved and protecting its own jurisdiction from misuse." And the Supreme Court held that under the circumstances there presented, the district court ought to have dismissed the Chapter XI petition and remitted the debtor to Chapter X.

In 1952 Congress altered Chapter XI in two respects relevant here. It added § 328, providing that "The judge may, upon application of the Securities and Exchange Commission or any party in interest, * * * if he finds that the proceedings should have been brought under chapter X of this Act, enter an order dismissing the proceedings under this chapter," unless the debtor amends its petition to seek Chapter X relief or a creditors' petition under that chapter be filed.[8] And it amended § 366, relating to confirmation, deleting the requirement that the proposed arrangement be "fair and equitable" and providing expressly that "Confirmation of an arrangement shall not be refused solely because the interest of a debtor, or if the debtor is a corporation, the interests of its stockholders or members will be preserved under the arrangement." [9] The only pertinent Supreme Court case since the 1952 amendments is General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956). That decision sustained the action of the District Court, 129 F.Supp. 801 (S.D.N.Y.1955), affirmed by this Court, 222 F.2d 234 (2 Cir. 1955), in dismissing a Chapter XI proceeding under § 328; speaking for the majority of the Court, Mr. Justice Douglas found that the dismissal did not transcend the allowable bounds of discretion, but rather was based upon a reasonable conclusion "that this business needed a more pervasive reorganization than is available under c. XI." Dismissal under Chapter XI was also directed in Mecca Temple of Ancient Arabia, etc. v. Darrock, 142 F.2d 869 (2 Cir.), cert. denied, 323 U.S. 784, 65 S.Ct. 271, 89 L.Ed. 626 (1944), and SEC v. Liberty Baking Corp., 240 F.2d 511 (2 Cir.), cert. denied, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed. 2d 723 (1947); retention under Chapter XI was approved in In re Transvision, Inc., 217 F.2d 243 (2 Cir. 1954), cert. denied, S. E. C. v. Transvision, Inc., 348

(1934). See Friendly, Some Comments on the Corporate Reorganizations Act, 48 Harv.L.Rev. 39, 41–45 (1934).

8. House Report No. 2320, 82d Cong. 2d Sess. (1952), at 19, U.S.Code Congressional and Administrative News 1952, p. 1980, states that the amendment "codifies the law of the United States Realty & Improvement case, and adopts the procedure of section 147 for transferring the proceeding to chapter X." The important benefit of this amendment was in avoiding the need for starting a new proceeding if Chapter X was found the appropriate vehicle after a Chapter XI petition had been filed.

9. The House Report stated that "the fair and equitable rule, as interpreted in Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), and Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), cannot realistically be applied" in a Chapter XI proceeding, House Report No. 2320, note 8 supra, at 21, U.S.Code Congressional and Administrative News 1952, p. 1981.

U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744 (1955); SEC v. Wilcox-Gay Corp., 231 F.2d 859 (6 Cir. 1956); and In re Lea Fabrics, Inc., 272 F.2d 769 (3 Cir. 1959), vacated as moot, S. E. C. v. Lea Fabrics, Inc., 363 U.S. 417, 80 S.Ct. 1258, 4 L.Ed. 2d 1515 (1960).[10]

It is difficult to extract much in the way of clear principle from these decisions, as indeed would be expected when Congress has authorized a corporate debtor seeking rehabilitation to follow either of two roads but has provided that a court "may"—surely not the strongest auxiliary verb known to our language—direct dismissal of a proceeding taken on one road if the debtor "should have" taken the other. Although there are some points of similarity between this case and the cases in which dismissal has been directed, there are points of difference which we think more important.

■ Insofar as the United States Realty decision rested on the impossibility of the debtor's meeting the "fair and equitable" test without sacrifices by the publicly held stock that were impossible to enforce under Chapter XI, 310 U.S. at 452–454, 60 S.Ct. at 1051–1052, one would suppose it to have been considerably affected by the 1952 amendment eliminating the "fair and equitable" requirement from Chapter XI. This was the view of the minority in General Stores, 350 U.S. at 471–472, 76 S.Ct. at 521–522 and the position of the majority, 350 U.S. at 466 and 467, 76 S.Ct. at 519, is not altogether clear to us.[11] In view of the emphasis in United States Realty on "safeguarding the public and private interests involved," 310 U.S. at 456, 60 S.Ct. at 1053, it seems important that here, in contrast to that case, Mecca Temple, and Liberty Baking (although not to General Stores), no publicly held securities would be readjusted. Although, as the SEC points out, the General Debentures, which are exempted from registration by § 393, subd. a(2), may themselves be traded, the SEC has not presented evidence showing any likelihood that such trading would reach significant proportions, and the nature of the securities would indicate the contrary. The SEC rightly emphasizes that the various transactions brought about under Gluck's auspices between the fall of 1960 and the filing of the petition demanded investigation. But a good deal of this has been had,[12] and the SEC does not particularize in what respects it considers this to have been incomplete.[13] Moreover, we do not read the proposed

---

10. The developments are reviewed in a series of articles, Weintraub, Levin, and Novick, Chapter X or Chapter XI: Co-existence for the Middle-Sized Corporation, 24 Fordham L.Rev. 616 (1956); Weintraub and Levin, A Sequel to Chapter X or Chapter XI: Co-existence for the Middle-Sized Corporation, 26 Fordham L.Rev. 292 (1957); Weintraub and Levin, Availability of Bankruptcy Rehabilitation to the Middle-Sized Corporation: The Third Circuit's Interpretation, 14 Rutgers L.Rev. 564 (1960).

11. In SEC v. Liberty Baking Corp., supra, 240 F.2d at 515 n. 4b, Judge Frank said as to this point that assuming, arguendo, that, if a plan is properly within Chapter XI, it need no longer measure up to that ["fair and equitable"] standard or to anything equivalent, nevertheless "in determining whether a proceeding properly comes within that Chapter, it is necessary * * * to determine, among other things, whether the proposed arrangement con-

tains features which bring it within Chapter X where the 'fair-and-equitable' standard is applicable and where alone the facts relevant thereto will be fully investigated."

12. In this respect the case differs sharply from Liberty Baking, where no § 21(a) examination had been conducted.

13. The questioning at the § 21(a) examination covered such matters as the circumstances, motives and method of Gluck's purchase of Grayson stock, the transfer of Klein stock to Klein in connection with the release of the guarantee of the Prudential loan, the economic strength of Grayson and Darling, the fairness of the Operating Agreement, the various charges of self-dealing, the losses incurred by Grayson immediately after the change of management, and the acquisition of the Beck stock. The questioning was done under the close surveillance of the experienced Referee. Although, as the SEC says, a party urging investigation cannot fairly

arrangement as releasing any claims of the debtor. We do not suggest that investigation through a vigorous § 21(a) examination and stockholders' suits [14] is just as good as an investigation by an independent trustee under Chapter X, § 167; we say only that the judge properly looked at what had already been done and at what may be done in the future in determining whether the benefits of a Chapter X investigation would outweigh the detriments of transfer to that chapter. As to the feasibility of the Plan, we cannot say the judge clearly erred when, although properly disclaiming "the prescience to prognosticate the outcome of the proceeding" and recognizing "that the Debtor's rehabilitation must follow an arduous and precarious course," he found that this "can be successfully negotiated in Chapter XI provided that management and creditors act in concert in the best interests of the Debtor." 215 F.Supp. 921, 935. Moreover, this issue of feasibility will again arise, with more recent information available, at the hearing under § 366(2) on confirmation.

■ However we might decide the case if the record contained no more than this, we do not feel warranted in upsetting the judge's exercise of discretion when there is added to the scales the evidence as to the drastic financial consequences of transfer to Chapter X. This point was not made at all in United States Realty, Mecca Temple, or Liberty Baking, and was not urged in General Stores with anything like the same seriousness and specific evidentiary support

as here. However much we as judges might be inclined to join in the SEC's queries why businessmen who have given credit to a debtor in possession under Chapter XI would refuse to do the same to a Chapter X trustee who had retained the debtor's management, the affidavits before the District Judge stated with particularity that this was indeed the case. It was open to the SEC to contradict this by factual evidence from suppliers, credit men, or expert witnesses, but it did not do so. The Commission is no more relieved from the need of producing evidence on such a factual issue than are other litigants; the willingness of Seventh Avenue garment makers to sell on credit is not a subject on which the SEC is so expert that arguments may be accepted as the equivalent of proof.[15] The prime objective of the Bankruptcy Act remains the simple one of getting creditors paid, and people engaged in trade are still the best judges of their own self-interest in that regard. A court takes a heavy responsibility when, in a proceeding under the Bankruptcy Act where no overriding public interest appears, it insists on steering the debtor into an alternate course which the creditors, with near unanimity so far as concerns those who have spoken,[16] assert will be disastrous. We recognize that, as urged by the SEC and the landlord-appellants, the trade creditors represented on the Creditors' Committee have an interest in continuing to do business with the debtor which is not shared by a landlord whose premises have been abandoned;[17] but their interest is surely not in

be required to show in advance what the investigation would disclose, it is not unreasonable, when a considerable investigation has been had, to require some rather specific indications of the alleged insufficiency.

14. The SEC's affidavit (p. 85) tells us that such suits are pending also with respect to the purchase of the Darling operation and the Operating Agreement.

15. Thus, it was not an adequate factual answer to argue that in the past some similar chains have been rehabilitated under

Chapter X and that some Chapter XI arrangements have gone awry.

16. Of course, the arrangement must be accepted by creditors representing a majority in both number and amount, § 362.

17. Stanley Roth's affidavit states that a position on the Committee was offered to counsel for the landlord appealing here but that he declined to serve. The district court might well consider whether the committee that is to exercise important functions under the arrangement ought not contain representatives of landlords. See §§ 363 and 364.

dealing with a debtor who they think will default either on current bills or on the terms of the arrangement. We are impressed also with the fact that the landlord of only one location has objected to proceeding under Chapter XI, although 30 locations were listed in the debtor's petition of September 4, 1962, for authority to reject leases and lease guarantees. Of course, if Congress had clearly decreed that a debtor seeking relief must follow a certain path, suppliers or employees could not be allowed to overrule the legislative mandate by a sitdown; in that event the path would have to be followed, even though it might predictably lead to disaster. Instead Congress has chosen to speak only in Delphic terms, and the Supreme Court has said that "The essential difference is not between the small company and the large company but between the needs to be served", General Stores Corp. v. Shlensky, supra, 350 U.S. at 466, 76 S.Ct. at 519. This is a case where no publicly held securities are being readjusted, the creditors have had vigorous independent representation, stockholder interests have offered substantial contributions, and rights to pursue claims for dereliction remain unaffected. In such circumstances a court can hardly ignore a substantially uncontradicted factual showing that Chapter XI affords some hope of paying off creditors whereas Chapter X offers none.

Affirmed.

On Petition for Rehearing

PER CURIAM.

Considering the petition for rehearing as addressed to the panel, as required by Rule 25(b) of this Court, the petition is denied.

On Petition for Rehearing in Banc

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

PER CURIAM.

The petition of the Securities and Exchange Commission for rehearing in banc is denied.

CLARK, Circuit Judge, dissents from such denial with an opinion.

SMITH and HAYS, Circuit Judges, dissent from such denial without opinion.

CLARK, Circuit Judge (dissenting).

The present petition would seem to present an *a fortiori* situation for a rehearing by the full court under any and all of the principles heretofore suggested for *in banc* hearings. See Walters v. Moore-McCormack Lines, 2 Cir., 312 F.2d 893, 894. The decision itself, which appears to be contrary to decisions of this court and of the Supreme Court, affects a great number of persons interested in this far-flung corporate empire. But further, it puts in jeopardy practically all attempts by the SEC to execute its statutory responsibility to investigate and supervise the reorganization of large corporations in this circuit, since the denial of such power in a case with the complexity of corporate relations here shown presages a potential battle in practically all such cases in the future. And the disagreement with previous precedents is highlighted by an interpretation of statutory amendments of 1952 at variance with our previous views. The confusion in legal principle thus engendered in the circuit having traditionally the greatest number of corporate reorganizations of the country seems to me thus quite obvious and to merit consideration by the full court.

To particularize further, it should first be noted that we have here all the criteria emphasized by the Supreme Court in the leading decisions of Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293, and General Stores Corp. v. Shlensky, 350

U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550, as requiring reorganization under SEC supervision in Chapter X proceedings, rather than an unsupervised arrangement under Chapter XI. The debtor's commercial empire is indeed expansive, including not only its own nationwide chain of women's and children's apparel shops, but also the operation of 130 women's apparel stores of Darling Stores Corporation pursuant to an operating agreement and the control of A. S. Beck Shoe Corporation, which manufactures shoes and owns and operates a retail shoe store chain of over 250 units. Until October, 1962, the debtor, through its "Peerless-Willoughby" division, was the largest retail seller of photographic and audio equipment and supplies in the United States. Grayson's common stock is listed on the New York Stock Exchange and is held by approximately 3,470 investors. As of August 14, 1962, 803,507 shares of common were outstanding. The stock of Grayson's subsidiary A. S. Beck is listed on the American Stock Exchange. Thus the public nature of the debtor would seem beyond debate.

Furthermore, the possibility that new management is sorely needed is suggested from the fact that until November 1960, when the present management gained control of Grayson, the debtor had enjoyed many consecutive years of profitable operation. It had a good ratio of current assets to current liabilities; and with but one minor exception, its assets were free from liens. The expansion program undertaken by the debtor's present management proved disastrous. As the Supreme Court noted in General Stores Corp. v. Shlensky, supra, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550, the need for an accounting by the management for misdeeds which caused the debacle and the need for new management are sure indicators of the desirability of a Chapter X proceeding, rather than one under Chapter XI.

The "Plan of Arrangement"—accepted by the district court and our panel here—also presents curiosities which would appear to require SEC expertise for its proper evaluation. It calls for no sacrifices from the stockholders, save only the surrender by Gluck, the chairman of the debtor's board of directors, of part of his Grayson stock holdings, with the right to repurchase any time in the next three years. Since, on its face, this aspect of the plan appears to be the necessary cost to Gluck of prolonging his management which heretofore has been so disastrous for the debtor, independent appraisal of whether Grayson got the better end of the bargain would seem imperative. Essentially the plan is but a long moratorium on any collection of the debtor's heavy liabilities. For the unsecured debts, including claims arising from the rejection, prior to confirmation, of executory leases and contracts, are to become "General Debentures" payable only in minimum fixed annual installments beginning in January 1965 and continuing for eleven years from the date of confirmation. There are no changes proposed in the debtor's structural ties with its related and subsidiary corporations; and while some safeguards are placed on further outlays of funds, raises in compensation of certain executives, and the like, it would seem that future financial exigencies, of the kind which are thought to call for hurried action here, may well lead to recurrent crises.

In other words, the optimistic predictions of management which has shown itself at the very least inept in the past do not deserve to be taken at face value, as is being done here and below. Indeed, as a practical and common-sense matter, the situation would seem compelling to call for that careful investigation which is the SEC's reason for existence. It parallels very closely the General Stores case, as well as Securities and Exchange Commission v. Liberty Baking Corp., 2 Cir., 240 F.2d 511, cert. denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723, and Mecca Temple of Ancient Arabic Order of Nobles of Mystic Shrine v. Darrock, 2 Cir., 142 F.2d 869, cert. denied 323 U.S. 784, 65 S.Ct. 271, 89 L.Ed. 626.

The only countervailing reasons for excluding the government agency charged with representing the public from considering a situation so requiring its study is that the creditors for the most part seem to be approving and that there is need for haste lest the business be disrupted. These would seem rarely controlling to furnish overriding objections to a case which the SEC on preliminary investigation believes should be the subject of further agency supervision. As the Supreme Court well said in the pioneering case of Securities and Exchange Commission v. United States Realty & Improvement Co., supra, 310 U.S. 434, 448, n. 6, 60 S.Ct. 1044, 1050, 84 L.Ed. 1293: "The basic assumption of Chapter X and other acts administered by the Commission is that the investing public dissociated from control or active participation in the management, needs impartial and expert administrative assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." It is quite natural for creditors threatened with the loss of all to accept a proffered half or a quarter loaf or less without full knowledge of corporate history which the SEC has the skill to develop. So the emphasis on speed is a customary step in pressure upon the creditors; it would seem of more doubtful validity even than usual here, where the only substantial action called for is that creditors bar themselves from pressing their claims for many years.

Finally the action of the panel in employing the 1952 amendments to Chapter XI as a means of substantially nullifying the United States Realty case requires the most careful review by the entire court. Actually the stated purpose of the legislators was to codify the holding of the United States Realty case. See H. R. 2320, 82d Cong., 2d Sess. 2, 3, 19; S.Rep. No. 1395, 82d Cong., 2d Sess. 20, U. S. Code Congressional and Administrative News 1952, p. 1960. Thus the addition of § 328 to Ch. XI provided an effective means of shifting a case from Ch. XI to Ch. X, the procedure here sought by the SEC. The amendment to § 366 so relied on had nothing whatsoever to do with the question of which procedure was to be required in a particular case; it dealt only with the confirmation of an arrangement after that procedure had been decided upon and substantially completed. Our understanding that no change in the criteria stated in the United States Realty case had been made by this amendment is clearly shown in our reference to it in General Stores Corp. v. Shlensky, 2 Cir., 222 F.2d 234, and in Securities and Exchange Commission v. Liberty Baking Corp., supra, 2 Cir., 240 F.2d 511, cert. denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 723. The Supreme Court's affirmance of our holding in the General Stores case, in General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550, without questioning this conclusion, though the amendment was heavily relied on by the two dissenting justices (350 U.S. 468, 471–472, 76 S.Ct. 520, 521–522, 100 L.Ed. 550), shows that our view was approved. Both in view of the statutory terms and of this background the panel repudiation of the conclusion appears doubtful.

The trend of the law as shown by this case fills me with a deep sense of nostalgia. When I came to the court a quarter century ago I was faced almost at once with the determination of my colleagues to reverse a district court decision that the United States Realty & Improvement Co. could not seek an arrangement under Ch. XI, but was limited to reorganization with SEC intervention under Ch. X. The arguments then made seem substantially those repeated in the panel opinion herewith. But we had the background of the monumental study conducted by Professor (later Mr. Justice) Douglas on the gross evils of the traditional equity reorganization of corporations, culminating in the extensive report of the Securities and Exchange Commission (pursuant to the direction of Congress), which sparked the Chandler Act revision of the Bankruptcy Act to

provide for agency supervision of large corporate reorganizations. And the question of choice between Ch. X and Ch. XI proceedings had been well covered in the prescient article by Rostow & Cutler, Competing Systems of Corporate Reorganization: Chapters X and XI of the Bankruptcy Act, 48 Yale L. J. 1334 (1939). So I summoned courage to dissent, In re United States Realty & Improvement Co., 2 Cir., 108 F.2d 794, 799–802; and in due course the Supreme Court reversed in a decision by Mr. Justice Stone (with three justices dissenting) to establish the principles as we now know them. Securities and Exchange Commission v. United States Realty & Improvement Co., supra, 310 U.S. 434. And in the three cases from this circuit cited above, we have filled in further details of this exposition; in two of these the Supreme Court denied certiorari, and in the third (the General Stores case) it affirmed in a reasoned opinion. Moreover, we have often expressed grateful appreciation to the SEC for its effective work in this field and have at times expressed regret that we have not had more of it. See Greene v. Dietz, 2 Cir., 247 F.2d 689, 695, 696, and cases cited.

So it would have seemed that these principles had been so firmly set that they could not be rejected in the summary and almost casual fashion as they are here disposed of. Now it appears that the battle for public supervision won in 1940 has all to be done again— if it can be rewon after this setback. It has been vigorously asserted that the regulatory agencies have been grievously at fault in not announcing rules and principles upon which they act. As concerns this agency, however, it would seem that it has had to expend so much of its time and energy in even maintaining a foothold on that regulation for which Congress had created it that it has little opportunity to build much beyond this. Compare Securities and Exchange Commission v. Capital Gains Research Bureau, 2 Cir., 300 F.2d 745, 751–754; s.c., 306 F.2d 606, 611–620, cert. granted 371 U.S. 967, 83 S.Ct. 550, 9 L.Ed.2d

538. So I hold that before we require such extensive refighting of old battles won, we should take time for a resurvey by the full court.

I dissent from the denial of a rehearing *in banc.*