**In the Matter of ALRAC CORPORATION f.d.b.a., Radiation Research Corporation f.d.b.a., the Alrac Company, Debtor.**

**Carl E. BARNES, Appellant,**

v.

**ALRAC CORPORATION, Debtor-Appellee.**

**No. 62, Docket 76–5014.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1976.

Decided March 3, 1977.

---

Edmond F. Supple, New York City (Robert C. Bell, Jr., New Canaan, Conn., Amend & Amend, New York City, and Richard L. Schmeidler, New York City, on the brief), for appellant.

Harvey R. Miller, New York City (Weil, Gotshal & Manges and William J. Rochelle, III, New York City, on the brief, for Chevron Research Co.; Brownstein, DiPietro & Kantrovitz, P.A. and Andrew M. DiPietro, Jr., New Haven, Conn., on the brief, for Alrac Corp.; Wiggin & Dana and Cheever Tyler, New Haven, Conn., and Greenfield, Krick & Jacobs and John H. Krick, New Haven, Conn., on the brief, for Creditors' Committee), for appellee.

Before HAYS, ANDERSON and GURFEIN, Circuit Judges.*

ROBERT P. ANDERSON, Circuit Judge:

On August 12, 1974, Carl and Sarah Barnes filed an involuntary petition in bankruptcy against Alrac Corporation, and on August 20, 1974, Alrac filed its petition under Chapter XI, § 321 of the Bankruptcy Act, 11 U.S.C. § 721. Carl Barnes, a creditor and major stockholder of Alrac, objected to the proposed Chapter XI arrangement and moved to have the proceedings transferred to Chapter X. On December 30, 1974, the bankruptcy court denied Barnes' motion; and on the following day, the bankruptcy court confirmed the arrangement proposed by Alrac under Chapter XI. Barnes appealed both orders to the United States District Court for the District of Connecticut which affirmed the orders of the bankruptcy court in an opinion dated February 9, 1976. Judgment was entered accordingly on February 20th. Barnes appeals from that decision. We affirm.

Barnes originally owned the patents on an improved type of nylon, called Nylon-4; and he was instrumental in organizing the Alrac Corporation in 1968 to develop a manufacturing process to exploit them. He was president and also a director of the corporation.

The critical problem which plagued the enterprise from the beginning was a shortage of working capital. As expedients it first merged with a publicly held corporation, Radiation Research Corp., but this did not afford a sufficient transfusion to accomplish the purpose. The merged company, under the name of Alrac, sold 3 million in debentures, then over a half a million in long term notes and over a million in short term notes. These measures, however, proved inadequate and Alrac then sought out a major corporation to take over Alrac Corporation. Ultimately acquisition terms were offered by Chevron Research Corporation which was very interested in the development of the Nylon-4 patents. Barnes, however, was in strong disagreement with the terms of the offer and, as the controlling interest favored it, Barnes resigned as a director in June of 1974 and the next month he was removed as president. After Barnes filed the involuntary petition in

---

* Circuit Judge HAYS concurred in the disposition of the appeal, but has not had an opportunity to review the opinion because of illness.

bankruptcy against Alrac, the terms of the acquisition agreement were worked out between Alrac and Chevron. One of its provisions was that Alrac would petition for an arrangement under Chapter XI. The remaining principal items, in brief, were interim funding of Alrac by Chevron during the Chapter XI proceedings; the transfer of substantially all of Alrac's rights in the Nylon-4 patents in return for minimum[1] annual royalty payments of $500,000, 1977 through 1990;[2] at closing Chevron was to pay $450,000; and a transfer from Alrac to Chevron of the rights to the development and marketing of Nylon-4 products.

The bankruptcy court, Seidman, *Judge*, granted permission to Alrac to enter into the agreement with Chevron. This enabled Alrac to to submit its proposed Chapter XI arrangement to the creditors with reasonable assurance that the suggested payment schedules could be met. The plan of arrangement divided the general creditors into the following classes:

*Class I* All persons or companies having supplied merchandise or services and who had claims up to $20,000.[3]

*Class II* All persons or companies having supplied merchandise or services and who had claims in excess of $20,000 and/or were holders of short term notes and/or were holders of senior notes.[4]

*Class III* All persons or companies having subordinated convertible debentures.[5]

The arrangement provided for full payment to Class I creditors with claims up to $100 and payments of $100 or 15%, whichever was greater, on claims in excess of $100. Class II and Class III creditors were to receive full payment of the principal amount of their debts with interest computed to August 20, 1974. The Class II debts were to be paid in installments over seven years according to a schedule annexed to the plan, which also provided that each Class II creditor was to receive a pro rata share of 750,000 shares of Alrac common stock to be issued. Class III creditors were to participate, pro rata, in another block of 750,000 shares of Alrac common to be issued in installments extending over eleven years.

On December 20, 1974, an adjourned meeting of creditors was held in the bankruptcy court for the purpose of determining whether a majority in number and amount of each class of creditors had accepted the plan as required by § 362 of the Bankruptcy Act, 11 U.S.C.A. § 762. Class II creditors accepted the plan by a large majority, and Class III members unanimously approved. The computation of acceptances of these groups is not disputed on this appeal. Barnes contends, however, that the bankruptcy court erred in concluding that a majority in number and amount of Class I creditors had accepted the plan. At the December 20th hearing, Alrac presented its computation of acceptances by Class I creditors. The original computation showed that their claims totalled $93,335.09 and that creditors holding claims amounting to $67,-192.37, which constituted a majority in number, had voted in favor of the plan. The bankruptcy court viewed the computation and, when Barnes objected that he had had no time to examine the claims and acceptances, the court granted a recess and gave Barnes as much time as he needed to review the relevant documents. In lieu of a recess, counsel for Barnes attempted to secure a ruling that objections to the compu-

---

1. The license agreement calls for royalty payments of 2% of net sales price of Nylon-4 and derivative products. The annual $500,000 payments are to be applied against Chevron's royalty obligations. If Nylon-4 becomes a fully marketable product within the life of the agreement and is sold in large volume, Alrac will receive payments in excess of the minimum royalties provided for in the agreement.

2. Chevron is not irrevocably bound to the terms of the license. It has retained the option to cancel during the first, third and sixth years.

3. Class I claims amounted to approximately $733,619.

4. Class II short term note holders and creditors with claims in excess of $20,000 aggregated approximately $1,277,224 in claims. Claims of senior note holders equaled $681,973.

5. The amount owed Class III creditors is $2,215,000.

tation could be preserved pending an opportunity to examine the claims and acceptances in detail. The bankruptcy court, however, informed him that he would either have to accept Alrac's computation or take advantage of the recess to examine the documents and raise any objections when the hearing resumed.

Following the recess, counsel for all parties agreed that there were slight discrepancies in the Class I computation but these did not change the outcome. An amended computation, reflecting the changes necessary to eliminate the errors contained in the original calculation of acceptances, was filed with the court. This showed that the total amount of Class I claims equalled $88,-156.73 and that thirty out of forty-three creditors with aggregate claims of $62,-014.01 had accepted the plan. The bankruptcy court closed the creditors' meeting with a finding that a majority in number and amount of creditors had accepted the plan. In its December 31, 1974 order confirming the plan of arrangement, the bankruptcy court reaffirmed this finding and concluded that the arrangement was both in the best interests of the creditors and feasible.

■ Barnes raised no objections to the amended computation on December 20th, but, in effect, seeks to do so now on this appeal by a highly technical argument of issues not raised or considered below, and based upon evidentiary material not presented at the trial. This he cannot do. *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); *List v. Fashion Park, Inc.,* 340 F.2d 457, 461 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

■ With regard to appellant Barnes' motion to transfer the Chapter XI proceeding to Chapter X, it is the primary duty of the bankruptcy court to evaluate the needs of the debtor. *General Stores Corp. v. Shlensky,* 350 U.S. 462, 466, 76 S.Ct. 516, 100 L.Ed. 550 (1956). As a rule, Chapter X is the appropriate proceeding for the adjustment of publicly held debt. *S. E. C. v.*

*American Trailer Rentals Co.,* 379 U.S. 594, 614, 85 S.Ct. 513, 13 L.Ed.2d 510; *S. E. C. v. Canandaigua Enterprises Corp.,* 339 F.2d 14, 20 (2d Cir. 1964). In *Canandaigua,* this court characterized the preference for ·Chapter X in cases involving the adjustment of publicly held debt as a rebuttable presumption, but the inclusion in a Chapter XI arrangement of elements that will affect a publicly held debt does not automatically mandate conversion to Chapter X. *S. E. C. v. American Trailer Rentals Co., supra,* 379 U.S. at 614, 85 S.Ct. 513. The court must also examine the extent to which publicly held debt is adjusted and the degree of deviation from the "fair and equitable" standard applicable to Chapter X proceedings, *S. E. C. v. Canandaigua Enterprises Corp., supra,* 339 F.2d at 21, as well as the need for the other protections contained in that Chapter, such as an independent trustee, see, *General Stores Corp. v. Shlensky, supra,* 350 U.S. at 466–67, 76 S.Ct. 516.

■ In the present case, the bankruptcy court found that the plan substantially met the "fair and equitable" test, § 221 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 621, which requires strict priority of creditors over stockholders. *See, Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). This finding is sufficient to support a determination that conversion from Chapter XI to Chapter X is not required. It is only the degree of deviation from a "fair and equitable" plan that needs to be considered. *See, S. E. C. v. Canandaigua Enterprises Corp., supra,* 339 F.2d at 21. In the present case, the only deviation from strict priority is the provision that Class I creditors with claims in excess of $100 receive 15%. All other classes will receive full payment of their claims. We are satisfied that the bankruptcy court's conclusion that the "fair and equitable" test had been substantially met is fully justified by the record.

The Chapter XI arrangement confirmed here affects publicly held debt and the equity ownership of the debtor. The deben-

tures bearing 7½% interest grouped in Class III had been issued to the public following registration with the Securities & Exchange Commission. The short term notes and 8½ convertible notes in Class II had been issued without registration and were held by insiders and friends. Under the plan of arrangement, the amount payable on these obligations is fixed with interest computed to August 20, 1974 and payment is spread out over seven years for Class II and eleven years for Class III. Prior to these proceedings, there were 1,043,056 shares of Alrac common stock outstanding which was held by approximately 1,500 shareholders. If the Chapter XI arrangement is put into effect, a new block of 1.5 million shares will be issued thus affecting the equity ownership of the debtor.

Although this "adjustment" of publicly held debt and equity indicates that there is a presumption in favor of Chapter X under *Canandaigua,* this presumption was sufficiently rebutted under the facts and circumstances of this case. The district court, after a careful and thorough review of the record, concluded that the bankruptcy court had made no clearly erroneous findings and had not abused its discretion either in denying the motion to transfer or in confirming the plan of arrangement. We agree. Moreover, there was no assurance that the debtor would survive the rigors of Chapter X, because the agreements with Chevron might be seriously jeopardized in such a shift and there was no need for an independent trustee. *See Grayson-Robinson Stores, Inc. v. S. E. C.,* 320 F.2d 940, 949 (2d Cir. 1963). Additionally, the adjustment of publicly held debt was not so substantial as to outweigh the factors favoring Chapter XI treatment. Full payment of the principal on Alrac notes and debentures has been provided for and the adjustment affected only the timing of the payments and the note holders' right to interest after August 20, 1974. When confronted with a Chapter XI arrangement that is overwhelmingly approved by the holders of the debtor's public debt, as in this case, the courts are usually reluctant to order conversion to Chapter X. Furthermore, it is relevant that the S.E.C. refused to intervene in this case, though it had the opportunity to do so, and took no position on Barnes' motion to transfer.

In confirming the plan of arrangement, the bankruptcy court found that it was feasible and that the modifications made after acceptance of the plan by the creditors were not of such a nature as to warrant submission of the plan, as modified to the creditors for a new vote. It also fulfilled its statutory duty by making an independent judgment of the plan's feasibility, and its finding on this point was not clearly erroneous. *See, In re Graco,* 364 F.2d 257, 258–59 (2d Cir. 1966). The bankruptcy court also correctly concluded that the modification of the plan was not prejudicial to the creditors' interests. The agreement to use best efforts to register the stock issued under the plan of arrangement constituted a benefit and the restrictive legend only recognized in accordance with the law that, except for a transfer of stock issued by the corporation to a creditor at the direction of the reorganization trustee, such unregistered shares were not freely transferable unless subject to an exemption. Resubmission to the creditors for a new vote on the plan of arrangement, as modified, was not required.

The judgment of the district court affirming the orders of the bankruptcy court, denying conversion to Chapter X and confirming the Chapter XI arrangement, is affirmed.